Erika A. Heath – State Bar No. 304683
**DUCKWORTH & PETERS LLP**
369 Pine Street, Suite 410
San Francisco, CA 94104
Telephone: (415) 433-0333
erika@duckworthpeters.com

FRANCIS MAILMAN SOUMILAS, P.C.
James A. Francis*
John Soumilas*
Lauren KW Brennan*
1600 Market Street, Suite 2510
Philadelphia, PA 19110
Tel:   (215) 735-8600
Fax:   (215) 940-8000
jfrancis@consumerlawfirm.com
jsoumilas@consumerlawfirm.com
lbrennan@consumerlawfirm.com

*Attorneys for Plaintiff and the Proposed Classes*

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF CALIFORNIA**

| | |
|---|---|
| **DILLON MALIN,** | C.A. No. 4:19-cv-07788-HSG |
| Plaintiff, | <u>**CLASS ACTION**</u> |
| v. | **AMENDED COMPLAINT AND DEMAND FOR JURY TRIAL** |
| **UBER TECHNOLOGIES, INC., AND CHECKR, INC.** | **FAIR CREDIT REPORTING ACT** |
| Defendants. | |

## INTRODUCTION

1. This is a consumer class action brought for violations of the Fair Credit Reporting Act, 15 U.S.C. §§ 1681 *et seq.* ("FCRA") against Defendant Uber Technologies, Inc. ("Defendant" or "Uber"). Defendant deprives consumers of their rights by taking adverse employment action against individuals without beforehand, providing them with notice and a copy of the report and summary of rights, in violation of FCRA section 1681b(b)(3).

2. Specifically, this case deals with Uber's practices for using background reports in connection with determining individuals' eligibility to drive for Uber. Uber uses these reports to take adverse action against individuals who seek to be employed, or who are already employed, as Uber drivers. Plaintiff contends that Uber takes adverse action against drivers or prospective drivers by terminating access to the Uber platform based upon FCRA-regulated consumer reports. At the time the driver's access to the Uber platform is terminated, Uber has not provided the individual with any notice, a copy of the report, a summary or rights, or any opportunity to dispute, contest, or explain the contents of the report.

3. Plaintiff now individually and on behalf of all others similarly situated, files this Class Action Complaint against Uber under the Fair Credit Reporting Act, 15 U.S.C. §§ 1681 *et seq.*, brought on behalf of other consumers who were removed from the Uber platform based upon "real-time" and other reports without receiving the notice required by federal law.

4. Plaintiff also in this action brings an individual claim for damages against Defendant Checkr, Inc. (hereafter "Checkr"), for violations of the Fair Credit Reporting Act (hereafter the "FCRA"), 15 U.S.C. §§ 1681 *et seq.*, *as amended.* for

its failure to assure the maximum possible accuracy of the information included in the report provided to Uber.

## JURISDICTION AND VENUE

5. Jurisdiction of this court arises under 15 U.S.C. § 1681p and 28 U.S.C. § 1331.

6. Venue lies properly in this district pursuant to 28 U.S.C. § 1391(b). Pursuant to L.R. 3-2(c)-(d), this case should be assigned to the San Francisco/Oakland Division of this Court because a substantial part of the events or omissions which gave rise to the lawsuit occurred in San Francisco County.

## PARTIES

7. Plaintiff Dillon Milan is an adult individual residing in Medford, OR.

8. Defendant Checkr is a business entity that regularly conducts business in the Northern District of California, and which has its headquarters and a principal place of business located at 2505 Mariposa Street, San Francisco, CA 94110.

9. Defendant Uber is a corporation which has a principal place of business in this District at 1455 Market Street, 4th Floor, San Francisco, California, 94103.

## FACTUAL ALLEGATIONS

*Uber's Operations And Use Of Background Reports*

10. Uber's business is based upon the operation of its mobile platform (or "app") which connects its drivers to passengers who request rides through the platform.

11. Uber pays drivers based upon completed rides, calculating the payment amount using a variety of factors including distance traveled, location, and level of demand. *See* https://www.uber.com/us/en/drive/driver-app/.

12. Uber drivers have the traditional role of employees, because Uber maintains a high degree of control over the conduct of its drivers' work. Uber exercises that control in a number of ways, including but not limited to: (a) Uber dictates the rates drivers charge, and controls the manner in which they are paid; (b) Uber furthermore prohibits drivers from engaging and transporting these same passengers separately from the Uber platform; (c) Uber penalizes drivers for rejecting potential rides, requires drivers to accept potential rides without knowing the passenger's destination and does not permit drivers to cancel rides once the destination is revealed; and (d) Drivers are not permitted to control the route driven – if they select a route that Uber deems "inefficient," the driver is penalized through a retroactive "fare adjustment."

13. Uber drivers also fit the role of employees under the "ABC test," adopted by the California Supreme Court in *Dynamex Operations, Inc. v. Superior Court*, 4 Cal.5th 903 (2018). Specifically, as described in the preceding paragraph, drivers are not free from Uber's control and direction in the performance of their work. The work performed by Uber drivers is the bread-and-butter of Uber's business. Uber drivers are also not customarily engaged in an independently established trade, occupation, or business of the same nature as the work they perform for Uber.

14. The State of California recently passed a law categorizing Uber drivers as employees. Cal. Assembly Bill No. 5, *codified as* Cal. Labor Code §§ 2750.3 3351.

15. Uber drivers regularly engage in interstate commerce by transporting passengers across state lines, by picking up a passenger in one state, and dropping the passenger off in a different state.

16. Upon information and belief Uber maintains detailed records regarding locations where passengers are picked up and dropped off for each ride, and is able to determine based upon these records whether a particular driver has picked up a passenger in one state and dropped them off in a different state.

17. Furthermore, Uber maintains detailed records regarding how much each driver is paid.

18. Uber routinely obtains consumer reports to conduct background checks on prospective drivers before allowing them to access its platform, and relies on the information contained in these background checks, in whole or in part, as a basis for adverse employment action.

19. Upon information and belief, Uber obtains all of its background check services from Checkr, Inc., a "consumer reporting agency" as defined by the FCRA.

20. Despite the nature of mistakes in consumer reports and background checks, Uber chooses, but is not required, to screen their job applicants through background reports.

21. Under the FCRA, any "person" using a consumer report, such as Uber, who intends to take an "adverse action" on a job application "based in whole or in part" on information obtained from the consumer report must provide notice of that fact to the consumer-applicant, and must include with the notice a copy of the consumer report and a notice of the consumer's dispute rights under the FCRA, *before* taking the adverse action. 15 U.S.C. § 1681b(b)(3)(A); *see also Goode v. LexisNexis Risk & Info. Analytics* 848 F. Supp. 2d 532, 542 (E.D. Pa. 2012) ("Under the FCRA, 'person' means any individual, partnership, corporation, trust, estate, cooperative, association, government or governmental subdivision or agency, or other entity. § 1681a(b).").

22. There is longstanding regulatory guidance for employers making clear their obligations and the protections afforded to job applicants under the FCRA. The Federal Trade Commission ("FTC") has long held that Section 604(b)(3)(a) [15 U.S.C. § 1681b(b)(3)(A)] "requires that all employers who use consumer reports provide a copy of the report to the affected consumer before any adverse action is taken. Employers must comply with this provision even where the information contained in the report (such as a criminal record) would automatically disqualify the individual from employment or lead to an adverse employment action. Indeed, this is precisely the situation where it is important that the consumer be informed of the negative information in case the report is inaccurate or incomplete." *See* Federal Trade Commission letter dated June 9, 1998 to A. Michael Rosen, Esq.

23. A primary reason Congress required that a person intending to take an adverse action based on information in a consumer report provide the report to the consumer before taking the adverse action is so the consumer has time to review the report and dispute information that may be inaccurate, or discuss the report with the prospective employer before adverse action is taken. *See* Federal Trade Commission letter dated December 18, 1997 to Harold R. Hawkey, Esq. ("[T]he clear purpose of the provision to allow consumers to discuss reports with employers or otherwise respond before adverse action is taken.").

24. Numerous courts interpreting the FCRA have found FTC opinion letters persuasive. *See*, *e.g.*, *Owner-Operator Independent Drivers Ass'n, Inc. v. USIS Commercial*, 537 F.3d 1184, 1192 (10th Cir. 2008); *Morris v. Equifax Info. Servs., LLC*, 457 F.3d 460, 468 (5th Cir. 2006). *See also Gager v. Dell Fin. Servs., LLC*, 727 F.3d 265, 271-72 n.5 (3d Cir. 2013) (affording some deference to Federal Communication Commission analysis and finding it persuasive in interpreting the Telephone Consumer Protection Act).

25. Consistent with that purpose, federal courts have held that the prospective employer must provide the report to the consumer "a sufficient amount of time before it takes adverse action so that the consumer may rectify any inaccuracies in the report." *Williams v. Telespectrum, Inc.*, 2006 WL 7067107, at *5 (E.D. Va. Nov. 7, 2006); *Beverly v. Wal-Mart Stores, Inc.*, 2008 WL 149032, at *3 (E.D. Va. Jan. 11, 2008) (quoting *Williams*). In *Reardon v. Closetmaid Corp.*, 2011 WL 1628041 (W.D. Pa. April 27, 2011), the court certified a class action for prospective employees who did not receive a copy of their consumer report at least five days before being notified that the employer might take adverse action.

26. The reasons for the "pre-adverse action notice" requirement with regard to employment situations are to alert the job applicant or employee that he is about to experience an adverse action, such as a rejection, based on the content of a report, and to provide him an opportunity to challenge the accuracy or relevancy of the information with the consumer reporting agency or the user before that job prospect or job is lost.

27. Uber regularly takes adverse action against drivers and prospective drivers based upon background reports without first providing them with the required pre-adverse action notice or an opportunity to challenge the information on the report.

28. In addition to pre-employment background checks, Uber subscribes to a product offered by Checkr which provides "real-time" consumer reports which include records of arrests allegedly pertaining to an individual who is the subject of the report, within 24 hours of the arrest.

29. Uber regularly obtains these "real-time" reports from Checkr about drivers currently active on the Uber platform, and uses them to determine whether a driver can continue to access the Uber platform.

30. Uber routinely, and as a matter of standardized policy and practice, removes a driver's access to the Uber platform immediately upon receiving a "real-time" consumer report pertaining to that driver from Checkr which contains an arrest record.

31. Removing a driver's access to the platform terminates their ability to complete rides and receive payment.

32. At the time Uber removes a driver's access to the platform based upon a "real-time" report from Checkr, it has not provided the consumer with notice, a copy of the report, and an opportunity to dispute the contents of the report.

33. Uber's practices cause substantial harm to consumers by eliminating their ability to earn income, in reliance on a hastily generated consumer report which may be inaccurate, without first giving the individual who is the subject of the report an opportunity to dispute or correct the information.

*The Experience of Plaintiff Dillon Scott Malin*

34. Plaintiff applied to drive for Uber in August 2019. He satisfied all of Uber's screening requirements, including passing a background check completed by Uber.

35. Plaintiff has been employed as a driver with Uber since at least August 2019, and continued to regularly drive for Uber during the following two months.

36. As part of his work driving for Uber, Plaintiff has picked up passenger(s) in Oregon at Medford Oregon Airport, and dropped them off at location(s) in the State of California.

37. On or about October 4, 2019, Checkr prepared a consumer report about Plaintiff and delivered it to Uber.

38. The October 4, 2019 Checkr report showed an arrest in Marion County, Oregon.

39. The date of the reported arrest was October 3, 2019.

40. The October 4, 2019 report was a "real-time" report.

41. The report contained inaccurate public record information, stating as follows: "Oct 3, 2019 Oregon DOC Booking Number 18027005 MARION County OR Full Name DILLON SCOTT MALIN YOB 1991 Charge Code 163175."

42. The report was inaccurate - Plaintiff was not arrested in Marion County, Oregon or in any other location on that date. Publicly available booking records for Marion County, Oregon for that date confirm that Plaintiff was not among those arrested.

43. As a result of Checkr's report, Uber immediately suspended Plaintiff's account, and he was unable to conduct any work for Uber.

44. Uber sent Plaintiff a communication on October 4, 2019 purporting to be a "Pre-adverse action notice" in compliance with FCRA section 1681b(b)(3). But by the time the notice was sent, Uber had already taken adverse action against Plaintiff by terminating his access to the Uber platform.

45. Plaintiff disputed the inaccurate reporting with Checkr on October 4, 2019, the same date he learned of the inaccurate report.

46. On October 11, 2019, Checkr sent Plaintiff an email, informing him "[w]e have completed our reinvestigation of the disputed information and have revised the information contained in your original report." Attached to the email was a revised report which no longer included the inaccurate arrest information.

47. Between the date of the report and the date of Checkr's correction of the same, Plaintiff was unable to conduct any work for Uber. His Uber application was not reactivated until October 11, 2019.

48. As a result of Uber's conduct, Plaintiff suffered damages, including without limitation and by example only: loss of revenues, loss of employment opportunity, damage to reputation, embarrassment, humiliation, and other emotional and mental distress.

49. At all times pertinent hereto, Defendant's conduct was a result of its deliberate policies and practices, was willful, and carried out in reckless disregard for consumers' rights as set forth under section 1681b(b)(3) of the FCRA, and further assumed an unjustifiably high risk of harm.

50. At all times pertinent hereto, Defendant was acting by and through its agents, servants, and/or employees who were acting within the course and scope of their agency or employment, and under the direct supervision and control of the Defendant herein.

## CLASS ACTION ALLEGATIONS

51. Plaintiff brings this action on behalf of the following Class of consumers:

  (a) **1681b(b)(3) Class:** All natural persons residing within the United States and its territories who, beginning five (5) years prior to the filing of this Complaint and continuing through the conclusion of this action, (i) were the subject of a consumer report prepared by Checkr, Inc. and delivered to Defendant (ii) Defendant took adverse action against the person based upon the report, and (iii) Defendant did not provide the applicant a copy of the report or a copy of the FCRA summary of rights at least five business days before taking the adverse action.

   **(b)** **Real-Time Report Subclass:** All natural persons residing within the United States and its territories who, beginning five (5) years prior to the filing of this Complaint and continuing through the conclusion of this action, (i) were the subject of a consumer report prepared by Checkr, Inc. and delivered to Defendant (ii) the consumer report included one or more items of information pertaining to an arrest, (iii) the report was prepared within 24 hours of the arrest, and (iv) Defendant terminated the consumer's access to the Uber platform within 24 hours of its receipt of the report.

52. The Class members are so numerous that joinder of all members is impracticable. Although the precise number of Class members is known only to Defendant, Plaintiff avers upon information and belief that the Class and Subclass members minimally numbers in the thousands.

53. There are questions of law and fact common to the Classes that predominate over any questions affecting only individual Class members. The principal questions concern whether the Defendant willfully and/or negligently violated the FCRA by failing to follow reasonable procedures to assure the maximum possible accuracy of the information contained in its reports about consumers.

54. Plaintiff's claims are typical of the claims of the Class and Subclass, which all arise from the same operative facts and are based on the same legal theories.

55. Plaintiff will fairly and adequately protect the interests of the Class and Subclass. Plaintiff is committed to vigorously litigating this matter. Further, Plaintiff has secured counsel who are very experienced in handling consumer class

actions. Neither Plaintiff nor his counsel has any interests which might cause them not to vigorously pursue this claim.

56. This action should be maintained as a class action because the prosecution of separate actions by individual members of the Class would create a risk of inconsistent or varying adjudications with respect to individual members which would establish incompatible standards of conduct for the parties opposing the Class, as well as a risk of adjudications with respect to individual members which would, as a practical matter, be dispositive of the interests of other members not parties to the adjudications or substantially impair or impede their ability to protect their interests.

57. Whether Defendant violated the FCRA can be easily determined by Defendant's policies and a ministerial inspection of Defendant's business records.

58. A class action is a superior method for the fair and efficient adjudication of this controversy. Management of the Class's claims is likely to present significantly fewer difficulties than those presented in many individual claims. The identities of the Class members may be derived from Defendant's records.

## COUNT ONE

### VIOLATIONS OF THE FCRA § 1681b(b)(3)

### (Class Claim vs. Uber)

59. Plaintiff incorporates the foregoing paragraphs as though the same were set forth at length herein.

60. The background or consumer reports that Uber purchases about its drivers are "consumer reports" within the meaning of 15 U.S.C. § 1681a(d).

61. The FCRA provides that any person "using a consumer report for employment purposes" who intends to take any "adverse action based in whole or in part on the report," must provide the consumer a written description of the

consumer's rights under the FCRA, as prescribed by the Federal Trade Commission, before taking such adverse action. 15 U.S.C. § 1681b(b)(3)(A).

62.    For purposes of this requirement, an "adverse action" includes "any . . . decision . . . that adversely affects any current or prospective employee." 15 U.S.C. § 1681a(k)(1)(B)(ii).

63.    Uber is a "person" that regularly uses consumer reports for employment purposes within the meaning of the FCRA.

64.    The FCRA requires Uber, as a user of consumer reports for employment purposes, before taking adverse action based in whole or in part on the report, to provide to the consumer to whom the report relates, a copy of the report and a written description of the consumer's rights under the FCRA. 15 U.S.C. § 1681b(b)(3)(A)(i), (ii).

65.    Defendant willfully and negligently violated section 1681b(b)(3) of the FCRA by failing to provide to the consumer about whom the report relates a copy of the report and a written description of the consumer's rights under the FCRA a sufficient time before it took adverse action based in whole or in part on the consumer report.

WHEREFORE, Plaintiff respectfully prays that an order be entered certifying the proposed Class and Subclass under Rule 23 of the Federal Rules of Civil Procedure and appointing Plaintiff and his counsel to represent the Class and Subclass; that judgment be entered for Plaintiff and the Class and Subclass against Defendant Uber for statutory, actual, and punitive damages for violation of 15 U.S.C. §1681e(b), pursuant to 15 U.S.C. §§ 1681n and 1681o; that the Court award costs and reasonable attorney's fees, pursuant to 15 U.S.C. §§ 1681n and 1681o; and that the Court grant such other and further relief as may be just and proper.

AMENDED COMPLAINT
DEMAND FOR JURY TRIAL

## COUNT TWO

### VIOLATIONS OF THE FCRA § 1681e(b)

### (Individual Claim vs. Checkr)

66. Plaintiff incorporates the foregoing paragraphs as though the same were set forth at length herein.

67. At all times pertinent hereto, Defendant Checkr is a "person" and a "consumer reporting agency" as those terms are defined by 15 U.S.C. § 1681a(b) and (f).

68. At all times pertinent hereto, Plaintiff was a "consumer" as that term is defined by 15 U.S.C. § 1681a(c).

69. At all times pertinent hereto, the above-mentioned credit reports were "consumer reports" as that term is defined by 15 U.S.C. § 1681a(d).

70. Pursuant to 15 U.S.C. § 1681n and 15 U.S.C. § 1681o, Defendant is liable to the Plaintiff for willfully and negligently failing to comply with the requirements imposed on a consumer reporting agency of information pursuant to 15 U.S.C. § 1681e(b).

71. The conduct of Defendant was a direct and proximate cause, as well as a substantial factor, in bringing about the serious injuries, actual damages and harm to the Plaintiff that are outlined more fully above and, as a result, Defendant is liable to the Plaintiff for the full amount of statutory, actual and punitive damages, along with the attorney's fees and the costs of litigation, as well as such further relief, as may be permitted by law.

# PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff seeks judgment in Plaintiff's favor and damages against the Defendants, based on the following requested relief:

(a) An order certifying the Class and Subclass pursuant to Fed. R. Civ. P. 23, and appointing Plaintiff and his counsel to represent them;

(b) Actual damages;

(c) Statutory damages;

(d) Punitive damages;

(e) Costs and reasonable attorney's fees; and

(f) Such other and further relief as may be necessary, just and proper.

Dated: 12/23/2019

Respectfully Submitted,

DUCKWORTH & PETERS LLP

BY:  _/s/ Erika Heath_____
ERIKA A. HEATH, ESQ.

FRANCIS MAILMAN SOUMILAS, P.C.
James A. Francis*
John Soumilas*
Lauren KW Brennan*
1600 Market Street, Suite 2510
Philadelphia, PA 19110
Tel:  (215) 735-8600
Fax:  (215) 940-8000
jfrancis@consumerlawfirm.com
jsoumilas@consumerlawfirm.com
lbrennan@consumerlawfirm.com

*Attorneys for Plaintiff*

\*application for admission *pro hac vice* forthcoming

## **JURY TRIAL DEMAND**

Plaintiff demands trial by jury on all issues.

Dated: __12/23/2019_____      Respectfully submitted,

DUCKWORTH & PETERS LLP

BY:   _/s/ Erika Heath_____
      ERIKA A. HEATH
      *Attorney for Plaintiff*